**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF KENTUCKY**
**LOUISVILLE DIVISION**

CIVIL ACTION NO. 05-130-C

KIMBERLY MIRACLE, ET AL.                                      PLAINTIFF,

V.                              **MEMORANDUM OPINION AND ORDER**

BULLITT COUNTY, KENTUCKY, ET AL.,                      DEFENDANTS.

* * * * * * * * * *

On November 17, 2008, this Court conducted a Fairness Hearing in order to assess whether the settlement reached by the parties in this litigation is fair, reasonable, adequate, and should be approved. Such hearing having been held, the Court finds as follows:

1.      This settlement was mediated by Judge Tom McDonald, an experienced mediator and former judge who knows the obligations of the Court in overseeing class action settlements of this kind. As a consequence of their experience in prior strip-search class action cases, counsel for the parties had not only a thorough understanding of the law and facts bearing on this litigation, but had researched the likely impact of those facts on a jury were this case not settled.

2.      The settlement in this case was reached only after numerous, private, arms-length negotiations between the parties, and after two settlement conferences mediated by Judge McDonald, in which each side repeatedly argued its position and argued the risks the other would bear were the case not settled. The strengths and

weaknesses of the case on both sides were thoroughly researched, explored through discovery, and argued in settlement.  There is no question but that counsel had sufficient information to arrive at an informed evaluation on which this settlement is based.

3.     This class action covers the period from March 2, 2004 to the present.  Plaintiffs claimed that the Bullitt County Detention Center ("the Jail") had in place a policy which required that all persons, even persons arrested for minor offenses, be strip-searched before their admission to the Jail's general population. The Jail, however, had in place a written policy which Defendants claimed prohibited the strip-searches of persons arrested for minor offenses on admission to the Jail unless there existed reasonable grounds for believing that such arrestees were carrying or concealing weapons or contraband.

4.     Liability was thus a vigorously contested issue in this case, unlike prior strip-search class action cases in Kentucky in which the defendants' unlawful conduct was actually directed by a written policy of the jail in issue.  It was unclear how many Plaintiffs would be willing to surrender their anonymity and bear the inconvenience of testifying at trial about an incident that many might consider personal and embarrassing.  Those that chose to testify would then be presented with the challenge of communicating to the jury their recollection of incidents that may have occurred more than three and one-half years ago.  Were Plaintiffs to prevail on the issue of liability, Plaintiffs would likely have then had to endure a

second series of trials, in which each Plaintiff's damages would likely be determined separately, and each Plaintiff would be confronted with the challenge of communicating to the jury the depth of the intangible damages -- the humiliation, shame and distress -- they sustained as a consequence of their strip-search.  Even were these damages effectively communicated to the jury, it was likely that jury verdicts would vary greatly in amount.  While a jury could award damages in excess of the sum a claimant might receive under this settlement, there was as great a chance that the jury might award significantly less, particular to those who have a lengthy criminal history.  Throughout the litigation, the question would remain whether jurors would be predisposed to believe law enforcement officials over other citizens, particularly citizens with a criminal record.  Counsel for Defendants were experienced litigators and would continue to provide a vigorous defense against all claims.

5.     Defendants were unwilling voluntarily to pay more to settle this case. Pushing on to trial would have significantly delayed Plaintiffs' recovery, if any.  Had trials eventually resulted in even greater total liability for the County, Plaintiffs would have been confronted with the additional delay of appeals, and depending on future circumstances, the additional risk of recoverability of the judgment.

6.     Class members under the settlement are divided into two groups:  (a) the named class representatives, who surrendered their anonymity and spearheaded this litigation throughout its course; and (b) the unnamed class members.  The

3

settlement provides that the named class representatives will divide among themselves the sum of $120,000.00.  Named class representatives, depending upon their length in service, will receive between $10,000.00 and $30,000.00 each.  The parties have previously provided the Court an Excel spreadsheet showing 32 prior strip-search class action settlements.  That spreadsheet shows that amounts typically paid named class representatives, in cases in which it can be determined, range between $10,000.00 and $25,000.00.

7.     This is all the named class representatives will receive -- they will not be entitled to any additional payment under the terms of the Settlement Agreement proposed to the Court.

8.     Not enough can be said for individual citizens, with no formal legal training, who believe their constitutional rights have been violated, exercise the initiative of contacting counsel, and then agree to surrender their anonymity and be named as plaintiffs in a civil rights case that becomes a matter of public record. The named class representatives participated in two mediations of this case, numerous meetings with counsel and periodic contact via telephone.  They have honorably discharged their responsibilities as named class representatives, and each approved the settlement that has now been tendered to the Court.

9.     The Court should encourage citizens to make the sacrifices and accept the responsibilities willingly undertaken and faithfully discharged by the named class representatives in this case.  The Court has compared these amounts to

4

settlements in comparable cases, and has found them reasonable, particularly given the named class representatives' numerous meetings with counsel and their attendance at two separate mediations, the faithful discharge of their duties, and the significance of this case, the uncertainty of its outcome, and the ultimate result.

10.     Unnamed class members with qualifying claims will receive a payment not to exceed $1500 each.  This amount compares very favorably even to settlements in which liability was not an issue.

11.     Defendants were unwilling to agree to caps any higher than these. The named class representatives had to choose whether to accept such caps, or reject such caps, scuttle the settlement, and proceed to trial with all the delay inherent in such a process, not to mention the ever-present risk of non-recovery. Given the hard financial realities presently confronting many potential claimants, the named class representatives decided to accept the caps and tender this settlement for the consideration of the class.  As previously noted, these caps nonetheless compare very favorably even to settlements in which liability was not an issue.

12.     Class members will only recover for one entry search, even though they may have been subjected to multiple entry searches.  However, allowing class members to recover for searches following multiple arrests would substantially complicate and increase the expense of class administration, thus reducing that portion of the settlement fund available to pay the claims of unnamed class

5

members.  The Court thus finds this provision of the settlement to be fair and

reasonable.

13.     Funds will revert to Defendants only if -- after all payments

contemplated by the settlement, including the maximum approved claimants can

receive under the terms of the settlement -- there remain any funds in the

settlement account.  As a consequence, the reversion provision of the proposed

Settlement Agreement in no way infringes upon the amount, fairness or

reasonableness of what will be paid to qualified claimants.  Moreover, as with the

per claim cap, reversion was a non-negotiable condition of settlement for

Defendants, and reflected a responsible effort on Defendants' part given public

funding of the settlement amount.

14.     No amount of the settlement fund will be set aside for late claims.

Establishing such a reserve would decrease the sums paid to qualified claimants if

the settlement fund would otherwise be exhausted by payment of approved claims.

In addition, a reserve would necessarily raise thorny issues of the amount of the

appropriate set-aside, the appropriate grace period to allow for late claims,

disparities in treatment of claimants, and what should be done in the event the

amount set aside is too much or too little.  These issues would unnecessarily

complicate an otherwise straightforward settlement process, and would increase

claims administration expense, thus reducing the recovery of approved claimants.

15.     Plaintiffs' counsel are seeking one-third of the settlement fund of

$800,000.00, or $266,666.67, in compensation for their work in this case.  Greg Belzley, lead counsel for the class, is an experienced litigator and a partner at Dinsmore & Shohl LLP.  He first became involved in strip-search litigation with the filing of Masters v. Crouch, 872 F.2d 1248 (6th Cir.), cert. denied, 493 U.S. 977 (1989).  He has since been lead counsel for plaintiffs in five strip-search class actions, three of which have previously been settled.  This case is one of two strip-search class actions now pending in Kentucky in which Mr. Belzley is lead counsel for Plaintiffs.  Mr. Belzley has argued numerous strip-search appeals before the First and Sixth Circuits, including an en banc proceeding before the First Circuit.  Mr. Belzley is highly experienced in the law, litigation and settlement of strip-search class actions.  Robert Walker is also an experienced litigator, and a partner at Walker, Vaughn & Wallace PLLC.  He and Mr. Belzley and their respective firms shared the load in this case.

16.    This Court has observed the conduct of these counsel throughout this litigation.  The record reflects that they have skillfully, effectively and zealously advocated the position of the class throughout these proceedings, and have achieved a fair and reasonable result for their clients.  Civil rights and class action litigation both involve complex issues of law and procedure.  Plaintiffs' counsel bore all fees and expenses during this litigation, and bore all risk of loss had Plaintiffs not prevailed.  The named class representatives each executed contingency fee agreements with Plaintiffs' counsel in which they consented to give their counsel as

much as 40% of the ultimate recovery.  They have unanimously approved Plaintiffs' counsel's request for one-third of the settlement fund as their fee, and the Court finds that such approval was voluntarily given and that the fee is reasonable.

17.    The notice of settlement and claim form were negotiated by the parties with input from the Court, and were ultimately approved by the Court.  The notice of settlement is simple and straightforward, as is the proof of claim form. The parties have created a claims process that can be understood and administered by the claimants themselves, regardless of their socio-economic or educational background.  Approved claimants will receive a substantial settlement simply by completing a proof of claim form and mailing it back to the Claims Administrator for verification and approval.  Each claimant whose claim is rejected will receive a letter explaining why the claim was rejected, and will be provided the opportunity of an appeal first to the Claims Administrator, and then to this Court.  There was no evidence at the hearing that claimants do not understand the terms of the settlement, find the proof of claim form confusing or hard to complete, or do not understand the process by which they may assert a claim for recovery of a portion of the settlement.

18.    4,935 notices have been mailed to potential claimants explaining the terms of the settlement and detailing the method by which claimants could file objections.  No objections to the terms of the settlement discussed above were

8

filed prior to the hearing, and only one person appeared at the hearing to object, and the Court regards this fact as additional evidence establishing the fairness, reasonableness and adequacy of the settlement under review.

19.   The Claims Administrator, Analytics, Inc., is continuing to seek potential claimants for whom it has no address or has a bad address, and mail notice as soon as a new address is found.  In addition, all persons who contacted Plaintiffs' counsel or the Claims Administrator to advise of their potential claim were also mailed claim forms.  Notice of the settlement will be published in the coming weeks in newspapers generally circulated in Bullitt County, and claimants have until February 17, 2009 -- ample time -- in which to file their claims.

20.   One unnamed class member, Mr. Lavey, appeared at the fairness hearing and objected to the settlement.  He stated that it was unfair to allow only one payment per class member no matter how many times that class member's constitutional rights were violated by being strip-searched upon entry to the detention center.  To the extent that the court addressed this issue during the preliminary approval of the settlement, those findings are reaffirmed.  The court additionally finds that there are two factors to be weighed – precision versus sufficiency.  On the one hand, compensating a claimant for every single constitutional violation precisely – thus the concept of precision – versus on the other hand, how much is enough to establish that there was a constitutional violation and to create a corrective action – thus the concept of sufficiency.  The

9

purpose here is not to pay people money, but to recognize that there are violations of constitutional rights and to provide a corrective function.  This was accomplished through several aspects of the settlement.  First, the parties agreed on a cap per claimant that was premised on a one-search limit.  Second, the settlement addresses the class as a whole and not merely individuals.  Third, the administrative process is made more complex and more costly if the one-search limit is not applied.  Fourth, the delay will be significant if there are administrative and factual disputes over multiple searches.  Fifth, there comes a point at which, instead of remedying a constitutional violation and trying to correct the facility's process, the settlement would begin to reward people for multiple arrests.  The line on this last aspect is adequately drawn by the one-search limit.  Additionally, some of the named class representatives were victims of multiple entry strip-searches. Given all the factors just enumerated, and given this tension between the notions of precision and sufficiency, the settlement adequately strikes the balance.  Finding that the settlement's provision allowing for only one recovery per class member is fair, reasonable and adequate, the court overrules the objection.

For all the reasons set forth above, the Court finds that the settlement in this litigation is fair, reasonable and adequate under the circumstances, and that the interests of the class as a whole are better served by this settlement instead of the pursuit of this litigation through trial.  By separate Judgment, claims of all class members who have not made a timely request to be excluded from the class will be

10

dismissed with prejudice.

Accordingly,

**IT IS ORDERED** that the class action settlement is **APPROVED** as fair,

reasonable, and adequate in accordance with Rule 23 of the Federal Rules of Civil

Procedure.

Signed on  November 19, 2008

*Jennifer B. Coffman*

**Jennifer B. Coffman, Judge**
**United States District Court**

11